Filed 8/29/16  In re H.W. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re H.W., a Person Coming Under the Juvenile Court Law. | B270572 (Los Angeles County Super. Ct. No. CK94581) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JASMINE C.,<br><br>        Defendant and Appellant. | |

    APPEAL from a judgment of the Superior Court of Los Angeles County. Robert S. Draper, Judge.  Affirmed.

    Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

    Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

The state has a duty to protect children. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) The Legislature, the Supreme Court, and the intermediate appellate courts have carefully crafted juvenile dependency law to carry out that duty. Sadly, state law was not well served in this case. H.W., removed from a violent home at age one, is languishing in the dependency system while approaching age six. "[T]here must be a limitation on the length of time a child has to wait for a parent to become adequate." (*Id.* at p. 308.) Statutory deadlines lapsed while the trial court coddled an unfit parent who could not regain custody, disrupting and causing uncertainty in H.'s life.

We cannot deduce the meaning of the trial court's recent, runic findings.[1] Fortunately, "[t]he fact that the action of the [trial] court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.) Substantial evidence in the record supports the court's order terminating parental rights as being in the child's best interest.

---

[1]     From the bench, the trial court ruled, "I do believe that the child will be greatly harmed and there will be substantial detriment if parental rights are not terminated," and it terminated parental rights. One week later, on February 5, 2016, the court issued a "statement explaining and clarifying" its order, writing that "the child would be greatly harmed and there would be substantial detriment to the child if mother's parental rights were terminated," without altering its order terminating parental rights. As we shall see, the court's written statement, which neither clarifies nor explains matters, is void.

## FACTS

### The Prior Appeal[2]

H.W. was born in December 2010, to Jasmine C. (Mother) and David W. (Father). In July 2012, when H. was one year old, the police were called to a gas station where Mother and H. were hiding: Father had attacked Mother after she refused his demand for money. He slapped her face, threw her on the ground, throttled her neck, impaired her breathing, then burned her neck with a cigarette, causing pain. After the attack, Mother grabbed H. and ran, while Father chased them and pushed Mother from behind. Mother admitted that Father has hit her in the past; their relationship has been abusive for four years. Father fled before the police arrived to arrest him for spousal assault and child endangerment.

Despite Father's propensity for domestic violence, H. regularly stays overnight with him because Mother feels that the child "is in need of her father." Mother did not want to press charges against Father. She rationalized that "Father had acted out of desperation with no intention to hurt her." However, she admitted that "each time that she brought the child to see him, he beat her up and traumatize[d] her kid." Mother did not seek a restraining order against Father because she feared retaliation.

The maternal grandmother (MGM) indicated that Mother has twice called her for help after being beaten up by Father, and stated that "mother and father have known that their altercations have negative effects on the child but they have deliberately ignored it." Father lives with the paternal grandmother (PGM), who denied hearing any altercation and suggested that Mother "has made up [the] story to get even with her son" for ending their relationship. The PGM noted that Father has a prior conviction for domestic violence; a new conviction will be his "third strike." She denied that Father abuses

---

[2]    A prior appeal was taken and an opinion was issued in *In re H.W.* (Aug. 4, 2015, B261152) (nonpub. opn). The facts described in this section are from that opinion, which is res judicata between these parties in this case. Unlabeled statutory references in this opinion are to the Welfare and Institutions Code.

women and described him as a loving and caring parent to H. Her statements were echoed by her husband, a stepfather to Father, who also denied hearing any altercation and accused Mother of retaliation and fabrication. The PGM and stepfather denied knowing the whereabouts of Father, who was sought by police.

A social worker deemed H. to be at "very high" risk for neglect and abuse. Father inflicted severe bodily harm on Mother, punching her on repeated occasions in the child's presence. He has disappeared and does not provide for his daughter's basic needs. H. was left in Mother's care.

A petition was filed alleging that the parents have a four-year history of violent altercations, and Father assaulted Mother while H. was present. Mother allows Father unlimited access to the child. On July 20, 2012, the court found a prima facie case for detaining H. from both parents, and ordered the Department of Children and Family Services (DCFS) to provide reunification services. The parents were allowed monitored visits.

For the jurisdiction hearing, DCFS reported that H. was placed with a paternal aunt. Father, born in 1983, has a criminal record beginning in 1997: it includes multiple arrests for assault; battery on a school employee; making terrorist threats; robbery; a burglary conviction; a conviction for assault with a deadly weapon on a spouse or cohabitant; a conviction for threatening a crime with the intent to terrorize; a conviction for assault with a deadly weapon; multiple drug arrests; and parole violations.

During an interview, the DCFS investigator noticed a circular burn mark on Mother's neck. Mother proceeded to deny that Father hurt her, describing herself as the aggressor. Mother claimed that Father "never put his hands on her, and if anything, she would hurt him." She added that "Her baby needs her daddy." Mother stated that "she hit herself with a door," which is why her face was red when the police arrived, not because Father slapped her. She denied that Father threw her to the ground or choked her. The burn mark on her neck occurred when she tried to remove a cigarette from Father. Mother acknowledged that she twice gave the police the same account of her injuries, which is an entirely different story from the one she is telling now. Mother

"indicates that there has been no previous domestic violence in the relationship." She is aware of Father's conviction for domestic violence, including an incident in which he broke a girl's jaw and ribs. Mother was 22 years old, and met Father when she was 18.

Father claimed that his arguments with Mother are verbal, not physical, and that Mother is the aggressor in their relationship. During the July altercation, Mother "ran up on him and ended up burning herself on the neck with the cigarette." He denied slapping or choking Mother, or seeing any injuries on her. Father acknowledged that he went to prison for making terrorist threats, characterizing it as "a whole bunch of nothing." He has not had any domestic violence counseling, and denies a history of drug or alcohol abuse. Father was vague when asked to explain a prominent tattoo just below his neck showing a woman shooting herself in the head with the words, "Broke, Bitch, Killer."

Father's "Statement Regarding Parentage" agrees that H. is his child; he provides for her needs and takes primary care of her. He has never lived with Mother or the child, and was not present at birth. Mother identified him as H.'s father.

The MGM was re-interviewed and said "she had no knowledge of the mother ever being in a relationship that involved domestic violence," and only recently heard that Mother and Father "got into it" because Mother was upset and mad. A police report of the July 2012 altercation indicates that Father demanded $50 from Mother; when she refused, he became enraged, slapped her, threw her down, straddled her, and pressed with both hands on her neck, saying "don't talk back to me, you're going to give me what I want." He grabbed a cigarette from an ashtray and burned her neck. Mother stated that Father previously hit her and beat her with a belt, but she never reported it before now. The police photographed her injuries.

On August 8, 2012, DCFS informed Mother that she has a limited time to reunify with her child and complete court-ordered programs. DCFS explained that if Mother fails to reunify, a permanent plan will be set that could result in loss of parental rights. Mother stated that she understood. Father stated that he understood, as well.

A supplemental report shows that in 2007, Father violently assaulted a woman, hitting her in the face, stomping on her neck, throwing a television at the victim, then

5

dropping the television on the victim's head six times while she tried to protect herself. When the victim went to clean the blood off, Father said, "I could have killed you." The police found the victim with obvious injuries on the face and neck, and a blood-stained television in her bedroom. Father pleaded guilty to charges of assault with force likely to produce great bodily injury.

Mother was homeless in September 2012. She attended parenting classes once a week, and rarely visited H. She had difficulty traveling for monitored visits, but when the venue was changed to accommodate her, she failed to show up. H. was living comfortably with her paternal aunt, who is a probation department officer, and her seven-year-old cousin.

On September 21, 2012, the court sustained the petition under section 300, finding that Mother and Father have a four-year history of violent altercations in which Father physically assaulted Mother; caused bleeding contusions on Mother's neck with a lit cigarette in the child's presence; slapped Mother's face and mouth; pushed Mother against a wall; threw her to the ground; choked Mother and impaired her breathing. He has struck Mother on prior occasions. Mother kicked Father. Mother failed to protect H. by repeatedly taking the child to Father's home and allowing him unlimited access to the child. Father's violent conduct and Mother's failure to protect the child place H. at risk of harm.

The parents were warned at the hearing that before there can be reunification, they must demonstrate the ability to meet the child's physical and emotional needs, and provide stable and appropriate housing. The court informed them that failure to participate regularly and make progress in court-ordered treatment programs may result in termination of reunification services and termination of parental rights if custody is not achieved by March 22, 2013. Mother was ordered to participate in a domestic violence program and individual counseling. DCFS had no discretion to allow unmonitored visits.

After the adjudication, family members continued to express disbelief that Father attacked Mother. H.'s aunt could not believe that Father would jeopardize his parole "for a measly fifty dollars." She knows that he served time for domestic violence, and agreed

6

that if DCFS and the police believed Mother's account, she would not risk her job by saying otherwise and understood that she must protect her niece. After reading the police report, the PGM continued to deny that Father harmed Mother.

Mother completed a 12-week parenting course, but did not have a stable living situation. In November 2012, Mother enrolled in an anger management and counseling program, and was given referrals to domestic violence support groups. In December 2012, Mother called the social worker, crying, saying that Father threatened to kill her and she was afraid. The social worker advised Mother to get a restraining order. One month later, Mother said she "was no longer afraid of [Father] 'because he just gets emotional and crazy like that.'" She did not obtain a restraining order. Father "acknowledged his mistake and is addressing it in counseling."

In February 2013, H. was detained after the paternal aunt requested her removal. Father made accusations that H. was sexually abused in July 2012, because the child said "ouch" during a diaper change, had a vaginal odor, and his seven-year-old nephew incurred a $190 charge while watching pornography at the PGM's home.[3] The caretaker denied Father's claims, but wanted H. removed owing to the false accusations against her son. Father requested unmonitored overnight visits with H.

Following removal from her aunt's home, H. had two foster placements. A forensic examination found "[n]o evidence of physical or sexual abuse or of child neglect." Mother continued to have an unstable living situation. She and Father faithfully visited H. H. is excited to see her parents, who are loving and affectionate with her. Mother indicated that she was almost done with counseling and was "working on my domestic violence classes," completing six of 32 sessions. Father believed that all he needed to do to reunify with H. was have unmonitored visits with her. He did not complete anger management or parenting classes, and was not enrolled in an approved domestic violence program.

---

[3]     H. was removed from parental custody on July 20, 2012.

In March 2013, DCFS recommended that the parents receive six more months of reunification services. The alternative recommendation was a permanent plan of adoption. Though the paternal aunt would have adopted H., the birth parents made false abuse accusations, jeopardizing her job at the probation department and creating stress and fear for her young son. Father came to her home, "yelling and causing a scene."

On March 21, 2013, Mother and Father engaged in domestic violence. While Mother drove Father to a visit with H., they argued and Father punched Mother in the face. Police officers saw swelling to Mother's cheek and arrested Father for battery. A month later, Mother had not yet sought a restraining order. DCFS opined that they have "not yet fully internalized the lessons" from their court-ordered programs.

On May 28, 2013, the court found that reasonable services were provided, but parental progress to alleviate the causes leading to detention was "minimal." There was no substantial likelihood that H. could be returned to parental custody within the next six months. The court terminated reunification services, and directed DCFS to place H. in a prospective adoptive home within one week. The parents were notified that a permanent plan hearing was set for September 23, 2013, at which time DCFS would seek to have the court terminate parental rights and implement a plan of adoption.

By September 2013, H. was living in the home of the L. family, who have two biological children and expressed commitment to adoption. H. had been in a stable placement with the L. family for five months; however, DCFS began assessing the PGM as a potential placement for the child. Mother and Father continued to visit H. During a visit in August, Mother was on her telephone cursing in the child's presence. When confronted, she denied using profanity. During visits, Mother engages with H., who smiles, is happy, and shows Mother affection.

On the day of the permanent plan hearing, Mother petitioned for a modification, stating that she "completed Phase I of the . . . Domestic Violence education program" and obtained a protective order against Father, whom she has not seen "since their last domestic violence incident." She requested six months of reunification services. The court denied the petition without a hearing: Mother did not show changed circumstances,

8

and "Mother's progress is very recent," given the latest incident of domestic violence. The court set a contested permanent plan hearing for November 15, 2013.

On November 15, 2013, DCFS asked to move H. from the prospective adoptive family to the PGM. DCFS made no mention of the PGM's vehement refusal to accept that her son batters women, an attitude that persisted even after the juvenile court sustained charges against Father. Father and Mother called the caregivers' home outside of approved hours, demanded to speak to H., and cursed. Father threatened the caregiver. Mother said of the caregiver, "that lady is trying to take my baby." DCFS sought more time to complete a home study on the PGM. The caregivers continued to seek adoption. The court (Judge Jacqueline Lewis) stated that "the chances of me placing [H.] with the paternal grandmother are very slim because, if the parents are unable to control themselves, then the Court is not going to be able to even think about placement with relatives."

In December 2013, Father was arrested for carjacking and grand theft, following a police pursuit. According to police reports, Father approached the victim, who was standing by his car, said, "What's up buddy," punched the victim in the head, causing him to fall to the ground, and stole his car. When Father finally gave up, he left the vehicle yelling, "I'm god, who are you, what authority do you have!" He was incarcerated. DCFS continued to ask the court to move H. to the home of the PGM.

A newly appointed judge (Connie Quinones) was assigned to the case, and placed H. with the PGM in February 2014. In June 2014, DCFS reported that H. received counseling to address emotional reactivity and temper tantrums. She had four placements since being removed from parental care. Mother visited H. twice per month at the DCFS office. The visits went well. Father was incarcerated, but calls H. weekly. DCFS continued to identify adoption as the permanent plan for the three-year-old. From February through August 2014, Mother missed most of her visits and did not call, leaving H. to sit and wait, unavailingly, in the DCFS lobby. The child was negatively affected, and cried as she speculated that "Maybe my mom's in jail." DCFS asked the court to reduce Mother's visits to once per month.

In September 2014, the court found that the conditions justifying jurisdiction still exist, and identified the appropriate permanent plan as adoption, which was likely to be achieved by March 2015. The court found that DCFS provided reasonable services.

Mother filed a new petition for modification in September 2014. She again stated that she "completed Phase 1" of a domestic violence program. Indeed, her petition was virtually identical to the one she filed exactly one year earlier, seeking to reinstate reunification services. The court scheduled a hearing on the petition.

In response, DCFS observed that Mother did not complete the second phase of her domestic violence program, completing 16 out of 32 classes. Mother has not attended sessions since August 2013, and was discharged from the program because she violated the rules by arriving at sessions with a male companion. Mother's behavior shows that she did not benefit from her programs: during a visit in August 2013, Mother yelled at a monitor in the DCFS office and used profanities; she called the caregivers' home and cursed at them; and in September 2014, Mother became belligerent at the DCFS office, yelling and cursing in the lobby. Mother attended only 10 anger management sessions and seven individual counseling sessions. DCFS asked the court to deny Mother's petition, because she did not complete the case plan in over two years.

At the hearing on October 15, 2014, Mother testified that she completed parenting classes, 10 individual counseling sessions, and Phase 1 of a domestic violence course. She admitted that she did not do Phase 2 because she was expelled from the program. She thought she only had to do 12 weeks of domestic violence, because her attorney and the social worker said so. She learned that she is the victim of domestic violence and needs to avoid people who harm her. Mother identified the "first incident" of violence as the one occurring in July 2012, and a second incident occurred in 2013, when Father punched her while she was driving.

Mother now has a restraining order against Father, who is incarcerated for the carjacking. Mother did not obtain a restraining order after the "first" incident because "I really didn't want to keep him from his daughter" and she always forgave him and gave him another chance. She visits H. twice per month, with a monitor at the DCFS office.

She has missed multiple visits in the last six months. Mother recently enrolled in—but had not started—a domestic violence course.

Both DCFS and H.'s attorney argued that Mother did not meet either prong for granting a petition for a modification: there are no changed circumstances and modification is not in the best interests of the minor. The court found that Mother "is a young lady who has been in this court since 2012. She had a little baby that was taken from her." Mother misunderstood the domestic violence requirements: though the case plan indicated 52 weeks, Mother completed Phase 1 (16 weeks), plus she has a restraining order against Father. These are changed circumstances. Mother has a tender bond with H. so the court decided to give Mother "the benefit of the doubt" and grant further reunification. Mother is required to complete Phase 2 of a domestic violence course, and a Phase 3, if there is one. In addition, she must participate in individual counseling. The court wanted Mother to have more visits.

The court found that continued jurisdiction is necessary, and that return of H. to parental custody would create a substantial risk of detriment to the safety, well-being and protection of the minor. Continued placement with the PGM is appropriate. Mother has made "satisfactory" progress toward alleviating the causes necessitating removal. The court continued the matter for six months. Minor's counsel objected to Mother visiting H. once a week, because it negatively affects the child. The court authorized Mother to visit once a week, over the objections of DCFS and minor's counsel.

DCFS appealed the trial court's order granting Mother reunification services on the day of the permanent plan hearing. We reversed because no substantial evidence supported the court's finding of changed circumstances. Mother was ordered in September 2012 to complete domestic violence and individual counseling, but had not done so in over two years. She continued to associate with Father, who threatened and attacked her during the pendency of this case. An extension of the proceeding was unwarranted because Mother cannot provide H. with a safe, stable home. We directed that the court conduct a permanent plan hearing without further delay.

11

## Subsequent Events and Proceedings

On April 10, 2015, DCFS filed a subsequent dependency petition alleging that Mother has a history of illicit drug use, is a current user of cocaine and marijuana, and is incapable of providing H. with regular care. Mother used drugs while pregnant, and tested positive for marijuana when she gave birth prematurely at 21 weeks on January 15, 2015. The baby died at birth.

Mother denied having a drug problem when questioned by DCFS; however, she told hospital staff that "[s]he uses marijuana regularly and cocaine on occasion." Medical records show that Mother tested positive for cocaine and marijuana on September 25, 2014, while pregnant. When confronted with the medical records, Mother stated that the test was wrong and "the hospital was out to get her." DCFS instructed Mother to drug test on demand, but Mother failed to appear for testing on March 27, 2015.

The coroner's report notes Mother's positive test for cocaine during pregnancy, and her diagnosis of chorioamnionitis, a bacterial infection that occurs before or during labor. The examiner attributed the baby's intrauterine death to pneumonia and prolonged rupture of membranes. Extreme prematurity contributed to the death, which was considered natural.

H. continued to be placed with the PGM, where she is thriving and happy, and looks to her grandmother for her needs. Mother visits H. at the DCFS office. The child is smiling, happy and affectionate with Mother, and did not want visits to end. Father was incarcerated.

Mother participated in 17 sessions of domestic violence counseling, with eight more to go. She tested positive for marijuana on April 16, 2015, then failed to appear for testing on April 29, 2015. DCFS asked the court to terminate services in light of Mother's positive drug tests.

A contested jurisdiction hearing was set. In a jurisdiction report, Mother admitted to daily use of marijuana during pregnancy. She denied using cocaine, and suggested that the drug may have been in a marijuana cigarette that she was smoking with other people. Mother began using marijuana when she was 15 years old. She does not have a medical

12

marijuana card. Mother tested negative for drugs on May 13 and 28, and June 1, 2015; she failed to appear for a drug test on June 15, 2015. H. is well-adjusted, presents no developmental concerns, eats by herself, has a vast vocabulary, can carry a conversation, follows directions well, and makes friends easily. Mother completed her domestic violence course.

On June 23, 2015, the trial court sustained the new petition arising from Mother's drug use. The court did not order reunification services. Instead, DCFS was ordered to provide permanent placement services. Mother was given monitored visitation twice weekly. The court set a selection and implementation hearing.

DCFS submitted a permanent plan report on September 22, 2015. H. was thriving and happy with the PGM. Mother has consistent weekly monitored two-hour visits with H. at the DCFS office. DCFS did not liberalize visits owing to Mother's positive drug tests and failures to appear for testing. H. "enjoys her visits with mom and will ask her when if she will almost go home with her [*sic*]." Mother was about to start individual counseling, a component of the 2012 case plan. Adoption was identified as the plan in H.'s best interest; the PGM is the prospective adoptive parent, and is committed to providing lifelong care to H.

Mother tested positive for marijuana on July 6, and had negative tests on July 27, August 10 and August 24, 2015. She continued to deny responsibility for the drug use that led to the filing of the new petition. DCFS asked the court to terminate parental rights.

A new judge was assigned to the case after Mother filed a peremptory challenge. A December 2015 status report states that H. continues to thrive with the PGM, where she was placed in February 2014, and with whom she is closely bonded. The PGM cares appropriately for H., the placement is stable and secure, and there are no barriers to adoption. Mother has monitored visits at the DCFS office. During visits, H. is happy, smiling, and affectionate with Mother. Mother failed to appear for a drug test on September 3, and tested negative on September 21 and December 7, 2015. She enrolled

13

in a 24-week drug counseling program, which she completed in December. She also completed an individual counseling program. Father is incarcerated.

The court directed DCFS to issue a supplemental report regarding Mother's visits. The addendum states that Mother visits twice a week: one visit is supervised by DCFS and the other by the PGM. "At the beginning the child [H.] would visit with mother with no incident. The child understood that she need[ed] to visit and return to the care of paternal grandmother. But lately [H.] will have tantrums and states that she does not want to leave mother's care." Mother and child "interact positively." Mother redirects H. when she inquires about the parents' relationship, but tells the child that she will be coming home soon. When the DCFS social worker returns H. to the PGM, "she is informed by caregivers that [H.] is being defiant and has been having more tantrum[s] than usual after her visits with mother. . . . The caregiver also reported that the child [H.] has made statements to them that she does not need to listen to them given that they are not her parents. In addition caregivers believe that the child [H.] believes that they are not allowed to discipline her given that she is going home with mother soon." DCFS recommended that visits cease, that parental rights be terminated, and that H. be freed for adoption.

A contested permanent plan hearing was conducted on January 27, 2016. The PGM testified that she is a staff supervisor at the district attorney's office and has worked for the county since 1977. Her long-time live-in boyfriend worked for the probation department for about 37 years, and is now employed elsewhere. A son lives with her who works as a substitute teacher and at the parks and recreation department.

The PGM testified that she has been H.'s caregiver for almost two years. She takes H. to school each day, then picks her up from daycare in the afternoon. She takes H. to doctor's appointments. Mother is not involved in taking the child to school or to the doctor. The PGM feels bonded with H. and is willing to care for the child for the rest of her life. She monitors Mother's visits once a week, and is willing to allow Mother to have contact with H. if parental rights are terminated. After visits with Mother, H. is

14

upset, so the PGM must calm the child down:  the PGM states that Mother "had discussed [H.] coming back to live with her.  And that was the problem."

The PGM speaks to Father once or twice a week, and updates him on H., but denies any intent to have him live in her home when he is released from prison. The PGM feels that H. needs counseling because the child "doesn't tell the truth most of the time." The PGM denies ever blaming Mother for Father's domestic violence arrest and incarceration.

Mother testified that H. was removed from her care at 18 months of age.  She visits "every chance I have," which is two hours twice a week.  During visits, "[w]e play. We read.  We eat our lunch.  We do any activity that we can do during the time that we have."  She has never been to H.'s doctor appointments, but would have gone if invited. H. refers to her as "mommy" and when she sees Mother she is happy, hugs Mother, and says she misses Mother.  The child cries hysterically when visits end, and is unwilling to let go of Mother.  Mother tells H. "to be patient and strong for me because you will be back soon."  Mother often speaks to H. on the telephone, and has her talk to other relatives in Mother's household.

When asked why her visits are still monitored, Mother replied, "I really don't know."  She acknowledged having positive drug tests, but noted that she completed a voluntary drug and alcohol program, as well as court-ordered individual counseling, which she participated in "to get my daughter."  Mother said, "I deserve my daughter.  I [] did nothing wrong to my daughter.  I never abused her, none of this.  None of this was any of my fault.  I was the one that was hurt."  Mother feels that H. will be terrified, hurt, heartbroken and uncomprehending if she never saw Mother again.

DCFS argued that Mother was given ample opportunity to reunify with H., but in the three and a half years since the child was removed, Mother has never had more than monitored visits twice a week.  Reunification services were terminated in May 2013, when Mother and Father engaged in domestic violence; nevertheless, Mother was granted additional reunification services in October 2014.  DCFS pointed out that "Mother, unfortunately for her, did not use that additional time in the best manner.  She in that time

period was using cocaine, marijuana. There was a [section] 342 petition sustained" owing to Mother's drug abuse. DCFS asserted that the court is required to terminate parental rights.

Minor's counsel joined in DCFS's argument, noting that no exception to the termination of parental rights applies, H. is adoptable, and the PGM is committed to adoption. Minor's counsel observed that Mother's monitored visits, twice a week, leave "very limited opportunities to demonstrate a parental role. Certainly not a parental relationship that would justify foregoing [the] permanence offered by an adoption. While the legal guardianship could be considered, your Honor, I would urge the court that keeping the parental rights intact would allow the parents to file motions. And, your Honor, given the history of the case, I think that would just be an invitation for further disruption." Mother was granted additional reunification services in 2014, yet during that period she abused drugs and a new petition was sustained. Mother's continued presence "does seem to be the inspiration for a lot of disruption in [H.]'s life."

Mother's counsel argued in favor of the parental bond exception. While visits have always been monitored, they are of "the best quality." Mother maintained consistent contact and is bonded with H., who will experience trauma if parental ties are severed. It would be unfair if Father is allowed to resume a relationship with H. upon his release from prison, while Mother is barred from seeing the child. Mother was not invited to take H. to doctor's appointments or engage in other parental roles.

### The Trial Court's Ruling

The court found the PGM to be an appropriate caregiver, having observed her in person and evaluated her credibility and caregiving skills. The court believes that the PGM will protect H. from Father when he is released from prison. The court noted that Mother was given six more months of reunification services, but "Mother didn't take advantage of that."

The court acknowledged that "only exceptional circumstances justify not giving the child the permanency of adoption." As to the first prong, requiring regular and consistent contact with the child, it was unclear to the court whether day-to-day

16

interaction with the child is necessary, "but what you need to have is [to] make sure it is not just a friendly relationship, that is a real parental relationship. And I find that in this case Mother does have a parental relationship with the child, which has created a bond between the mother and the child." As to whether the child would be greatly harmed if parental rights were terminated, the court stated, "if Mother had ever been allowed to have unmonitored visits, I would find this, as a legal matter, hard to question. But I think, unfortunately, the case law is fairly clear, that if the only thing that the mother has had is monitored visits, it is almost impossible to overcome—to meet that second prong." The court found that the child is adoptable, there are no impediments to adoption, and that "it will be detrimental to the child to be returned to the parents. The court finds that no exceptions to adoption apply in this case" and it terminated parental rights. Mother appeals.

**DISCUSSION**

**1. Scope of Review**

When reviewing an order terminating parental rights, we determine if it is supported by substantial evidence. All conflicts are resolved in favor of the prevailing party and all legitimate inferences are drawn to uphold the ruling. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Xavier G.* (2007) 157 Cal.App.4th 208, 213.)

Our review does not encompass the trial court's February 5, 2016 "statement explaining and clarifying the court's findings of 1/27/16." The court may "correct clerical mistakes in its judgment or orders as entered." (Code Civ. Proc., § 473, subd. (d).) "Admittedly, a trial court upon its own motion or on *ex parte* application, has jurisdiction to correct mistakes in its orders and records which are not actually the result of the exercise of judgment. [Citations.] But where the error is inherently judicial rather than clerical or inadvertent, the court has no power to amend its decision." (*Estate of Burnett* (1938) 11 Cal.2d 259, 262.) If a modification is the result of judicial reasoning and determination, it is not clerical error, and is void. (*Rochin v. Pat Johnson Manufacturing Co.* (1998) 67 Cal.App.4th 1228, 1237-1238.) The statement purported to vacate the court's finding that it would be detrimental for H. to be returned to Mother's

17

physical custody, because the finding was "unsupported by the evidence." This is a judicial error, not clerical error.

"A trial court lacks jurisdiction to amend a judgment ex parte in a manner not prescribed by statute." (*Manson, Iver & York v. Black* (2009) 176 Cal.App.4th 36, 43.) Mother did not move for a new trial. (Code Civ. Proc., § 657 et seq.) Nor did the trial court vacate the judgment terminating parental rights. (Code Civ. Proc., § 663.) Instead, the court's written statement either embroidered upon or flatly contradicted judicial determinations made at the permanent plan hearing. "[I]t plainly appears and we decide as a matter of law that in entering the amended judgment the court was attempting to correct perceived judicial error." (*Rochin v. Pat Johnson Manufacturing Co.*, *supra*, 67 Cal.App.4th at p. 1238.) There is no statutory basis authorizing the court's February 5, 2015 statement, so we cannot consider it.

**2. The Termination Order Is Supported by Substantial Evidence**

Once reunification services are terminated and a section 366.26 hearing is set, the primary focus is on the child's need for permanency and stability; a parent's interest in the care, custody and companionship of the child is no longer paramount. (*In re Marilyn H.*, *supra*, 5 Cal.4th at pp. 309-310; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) Children have a fundamental right to a placement that is stable and permanent. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419.) Termination of reunification services "ordinarily constitutes a sufficient basis for terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 236-237.)

At the selection and implementation hearing, if the court finds that the child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532.) Adoption is the permanent plan preferred by the Legislature "'because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker,'" unlike a revocable guardianship. (*In re Celine R.* (2003) 31 Cal.4th 45, 53; *In re Jasmine D.*

18

(2000) 78 Cal.App.4th 1339, 1348; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)[4] At this stage, after the child has been under juvenile court jurisdiction for an extended period, it is "inimical to the interests of the minor" to burden efforts to place the child in a permanent home. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256.)

In exceptional circumstances, a parent may avoid termination of parental rights by showing that it would be detrimental to the child. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) Mother asserts that termination of parental rights would be detrimental because she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent carries the heavy burden of proving both visitation and that the child holds the parent in a parental role and would be greatly harmed by termination of parental rights. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

"To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466, citing *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342, *In re Casey D.* (1999) 70 Cal.App.4th 38, 50, and *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348. See also *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

---

[4]     Mother does not dispute that H. is likely to be adopted.

19

Mother argues that she consistently visited H. "From February through August 2014, Mother missed most of her visits and did not call, leaving H. to sit and wait, unavailingly, in the DCFS lobby. The child was negatively affected, and cried." (*In re H.W.*, *supra*, B261152, at p. 9.) Mother's monitored visits were very limited by court order. DCFS did not liberalize visitation along the way, owing to Mother's association with Father, and because she missed drug tests and tested positive for drugs when the new petition was sustained. Plus, she refused to accept the validity of the test results. Nevertheless, her visits have been consistent since late 2014 until the second permanent plan hearing in January 2016.

Mother argues that the visits were positive, that H. expressed affection and cried when visits ended. In 2014, minor's counsel warned the court that Mother's visits negatively affect the child; a year later, minor's counsel reiterated that Mother is "the inspiration for a lot of disruption in [H.]'s life." The PGM reinforced this view: she testified that H. is defiant and refuses to be disciplined or obey, saying that she does not need to listen because the PGM is not her parent. Mother inappropriately told the child that she is coming home soon, thereby encouraging misbehavior.

Evidence that a parent has maintained "frequent and loving contact" is not sufficient to establish a beneficial parental relationship if Mother does not occupy a parental role. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109; *In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.) A parental relationship "'"characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." [Citation.] Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."'" (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165-1166 [mother's supervised visits went well and the children

reacted positively to her, but this evidence fell short of showing that the relationship promoted the children's well-being to such an extent as to outweigh adoption].)

Mother has not occupied a parental role since 2012, when H. was 18 months old. Rather than take steps to distance herself from Father, create a safe home, and regain custody of H., Mother continued to associate with Father, refused to obtain a restraining order when he beat and threatened her, rationalized his violent behavior, and took nearly four years to complete the case plan. During that time, a new petition was sustained against her: she tested positive for cocaine and marijuana on September 25, 2014, shortly before the trial court granted her additional reunification services on October 15, 2014. Owing to her failure to timely complete the case plan and the new sustained petition, Mother was never able to take custody.

In *In re Beatrice M.*, the mother had a history of substance abuse, but had been sober for 18 months. She visited her children daily, lived in an apartment below the children's caretaker, occasionally took care of them, and the children called her "mommy." The social worker testified that the mother's visits were regular and beneficial. The mother was unable to take custody, but felt that the children would benefit from continuing the relationship, so that the exception applied and a long term guardianship should have been established. (29 Cal.App.4th at pp. 1415-1420.) The court heeded the legislative mandate that dependent children who cannot be reunified with their parents be provided the most stable possible home. A parent who has frequent and loving contact, akin to that of an extended family member, but who does not have a mother/child relationship, cannot demand a long-term legal guardianship because the child is entitled to a permanent adoptive home. (*Id.* at pp. 1420-1421.)

While H. is bonding with her prospective adoptive parent, Mother never progressed to the point where she can have unmonitored or overnight visits, even if her visits are enjoyable. As Mother points out, monitored visits do not foreclose a parental relationship, but the constraint makes such a finding "difficult": "The difficulty is due to the factual circumstances of the parents in failing to reunify and establish a parental, rather than caretaker or friendly visitor relationship with the child." (*In re Casey D.*,

21

*supra*, 70 Cal.App.4th at p. 51.)  A relationship that is "pleasant" and even "emotionally significant" is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.)  "Interaction between natural parent and child will always confer some incidental benefit to the child."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Though Mother was not spontaneously invited to take H. to school or to doctors' appointments, there is no evidence that Mother ever asked to do so, or sought to participate in the child's life activities at the PGM's house by purchasing food and preparing meals, bathing H., purchasing clothing, or doing anything else that characterizes a parental relationship.  Mother did not strive to create a substantial parental relationship with H.  Naturally, H. loved seeing Mother, which was easy and enjoyable, as opposed to being with the PGM, who made rules and imposed discipline.  Mother undermined the PGM by falsely telling H. that the child was coming home soon, so H. felt no need to obey her grandmother.

H. spent the first 18 months of her life with Mother and was "traumatized" by parental domestic violence, according to Mother.  Since that negative start to her life, H. has spent the remainder of her nearly six years in foster care, happy, thriving and bonding well with her caretakers.  Mother's love for H. is not so beneficial as to outweigh the benefits H. receives in a safe, stable, permanent home.  Contrary to the trial court's sentiments, the victim in this case is H., not Mother.  Taking the court's reasoning to its natural conclusion, every parent would be deemed the victim of his or her own bad judgment in endangering their child's physical and emotional well-being by engaging in drug abuse or exposing the child to domestic violence, instead of protecting the child. That is surely not the purpose of dependency law.

22

## DISPOSITION

The judgment (order terminating parental rights) is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                         BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.